UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 15, 2009**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | **Charges:** |
| | : | |
| **SHELLY S. SINGHAL,** | : | **18 U.S.C. § 371 (Conspiracy)** |
| | : | |
| | : | **18 U.S.C. § 1341 (Mail Fraud)** |
| **Defendant.** | : | |
| | : | **15 U.S.C. §§ 78j(b) and 78ff, and** |
| | : | **17 C.F.R. § 240.10b5 (Securities Fraud)** |
| | : | |
| | : | **18 U.S.C. § 2 (Aiding and Abetting** |
| | : | **and Causing an Act to be Done)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(C) and 28** |
| | : | **U.S.C. § 2461(c) (Criminal Forfeiture)** |

**INDICTMENT**

The Grand Jury charges:

**GENERAL ALLEGATIONS**

At various times relevant to this Indictment:

**Persons, Entities and Methods**

1.     The defendant SHELLY S. SINGHAL and others, both known and unknown to the Grand Jury, engaged in a conspiracy and scheme to defraud the investing public through the use of stock manipulation schemes, including a scheme referred to as "scalping."

2.     A scalping scheme involves trading on securities with advance knowledge that favorable promotional materials on such securities are to be publicly disseminated. Generally,

the perpetrators of a scalping scheme obtain control over free trading shares of a company. Free

trading shares are registered shares of stock that the owner can trade without restrictions on a

national securities exchange, *e.g.*, the New York Stock Exchange, the NASDAQ, or the Over-

the-Counter Bulletin Board ("OTCBB"), a regulated quotation service that displayed real-time

quotes, last sale prices, and volume information for certain over-the-counter securities.

3.      In obtaining such free trading shares, the perpetrators intend to disseminate

favorable promotional materials to raise investor interest in the shares. These promotional

materials tout a particular stock and encourage innocent investors to purchase the stock. The

promotional materials misrepresent and conceal the perpetrators' involvement in the promotions

and fail to disclose their intent to sell their shares into the demand created by them. After

increasing investor interest in the shares in the manner described above, the perpetrators then sell

the shares they own and control to unsuspecting investors.

4.      The conspiracy and scheme to defraud operated out of the Newport Beach,

California offices of SBI USA, LLC ("SBI USA"). SBI USA was a California limited liability

company formed on or around October 15, 2002. SBI USA was an investment company engaged

in the business of providing investment advisory services as well as buying and selling securities

that were traded primarily in the over-the-counter markets.

5.      The defendant SHELLY S. SINGHAL resided in Newport Beach, California. The

defendant SHELLY S. SINGHAL, a registered representative associated with a registered broker-

dealer, was the owner and Chairman of SBI USA. The defendant SHELLY S. SINGHAL

directed SBI USA's business operations, including the trading of securities for SBI USA's

benefit in brokerage accounts that it controlled.

6.      Businessperson B-2 was an employee of SBI USA who resided in Rolling Hills Estates, California.

7.      Businessperson C-1 was a businessperson who resided in Houston, Texas.

8.      Infinium Labs, Inc. ("Infinium") was a Delaware corporation located in Sarasota, Florida, which developed a broadband video game delivery system to allow consumers to purchase and play games directly over the internet. The common stock of Infinium was publicly traded on the OTCBB under the ticker symbol "IFLB." Infinium became a publicly traded company in and around January 2004 as a result of a reverse merger. SBI USA provided investment advisory services to Infinium.

9.      IT&E International Group ("IT&E") was a Nevada corporation located in Solana Beach, California. IT&E was involved in providing consulting services in the areas of FDA regulatory compliance, data management, biometrics and clinical validation throughout the clinical trials life cycle. IT&E was publicly traded on the OTCBB under the ticker symbol "ITER." IT&E became a publicly traded company in and around April 2004 as a result of a reverse merger. SBI USA provided investment advisory services to IT&E.

10.      Aztec Oil & Gas, Inc., formerly known as Aztec Communications Group, Inc. (collectively, "Aztec") was a Nevada corporation located in Houston, Texas. Aztec was involved in purchasing interests in producing oil and gas properties with undrilled reserves. Aztec was publicly traded on the OTCBB under the ticker symbol "AZGS." SBI USA provided investment advisory services to Aztec. Businessperson C-1 provided consulting services to Aztec.

11.      Robert S. Brown resided in New Rochelle, New York. Brown beneficially owned and controlled a nominee account for the receipt, purchase and sale of IT&E and Aztec shares.

3

12.     Melissa A. Mahler resided in Rochester, New York.  Mahler beneficially owned and controlled a nominee account for the receipt, purchase and sale of Infinium shares.

13.     Jukka Tolonen was involved in stock promotions, resided in Sugarland, Texas, and in August 2000 was the subject of a civil action by the Securities and Exchange Commission alleging violations of the anti-touting provisions of the federal securities laws and permanently enjoining him from future violations of Section 17(b) of the Securities Act of 1933.  Tolonen promoted stocks by preparing financial newsletters, generally 8-12 page, color brochures focused primarily on individual companies, which were distributed to public investors through mass mailings using the U.S. Postal Service.  At the direction of the defendant SHELLY S. SINGHAL and others, Tolonen promoted Infinium, IT&E and Aztec shares.

14.     Nominee B resided in Newburg, Oregon.  Nominee B beneficially owned and controlled a nominee account for the receipt, purchase and sale of Infinium shares.

15.     Nominee C resided in Pasadena, California.  Nominee C beneficially owned and controlled a nominee account for the receipt, purchase and sale of Aztec shares.

16.     Nominee D resided in Heathrow, Florida.  Nominee D owned and controlled an account in the name of a trust for the receipt, purchase and sale of Infinium shares.

17.     Credit Union A was a company incorporated under the laws of Hong Kong.  The defendant SHELLY S. SINGHAL was an investment advisor to Credit Union A.

18.     Alpharetta Merchant Partners, LLC ("Alpharetta Merchant Partners") was a Delaware limited liability company formed on and about October 19, 2004.  The sole member of Alpharetta Merchant Partners was Nominee B.

19.     Bedford Proprietary Trading, LLC ("Bedford Proprietary Trading") was a Delaware limited liability company formed on and about September 7, 2004.  The sole member of Bedford Proprietary Trading was Nominee C.

20.     SBI Advisors LLC ("SBI Advisors") was a Delaware limited liability company formed on or around December 3, 2003, with offices in Newport Beach, California.  The initial members were SBI USA and Robert Brown.

21.     SBI Brightline LLC ("SBI Brightline") was a Delaware limited liability company formed on or around November 7, 2003, with offices in Newport Beach, California.  The initial members were SBI USA, Robert Brown and Nominee B.

22.     SBI Oil and Gas Resource Exploration LLC ("SBI OGRE") was a Delaware limited liability company formed on or around August 5, 2004, with offices in Newport Beach, California.  The initial members of SBI OGRE included the defendant SHELLY S. SINGHAL, Businessperson B-2, Robert Brown and a limited liability company controlled by a close family relative of Melissa Mahler.

23.     Wire Mill Partners II, LLC ("Wire Mill Partners II") was a Delaware limited liability company formed on and about April 5, 2004.  The initial member of Wire Mill Partners II was a close family relative of Robert Brown.

24.     Company A was a business that provided financial information products focused on China's financial markets, and was an integrated provider of market indices, ratings, financial news and analysis and investor relations for China.  Company A was headquartered in China.  On or around October 28, 2004, Company A's shares began to trade on the Mothers Board (market of the high-growth and emerging stocks) of the Tokyo Stock Exchange.  Company A's Chief

5

Executive Officer was a person hereinafter referred to as Businessperson A-1. The defendant

SHELLY S. SINGHAL was a member of Company A's board of directors.

25.     The United States Securities and Exchange Commission ("SEC"), with its

headquarters in the District of Columbia, is an independent agency of the United States

government responsible for enforcing the federal securities laws, which are designed to provide

the investing public with full disclosure of all material facts regarding matters involving the

offer, purchase, and sale of securities, among other things. These laws protect the investing

public in the purchase of stock that is publicly distributed by maintaining fair and honest

securities markets and eliminating manipulative practices that tend to distort the fair and just

price of stock.

26.     To sell securities to the public, Infinium, IT&E and Aztec were required to

comply with the federal securities laws, including the Securities Act of 1933, the Securities

Exchange Act of 1934, and regulations promulgated thereunder. These laws and regulations are

designed to ensure that a publicly owned company's financial information is accurately recorded

and disclosed to the public. Under these regulations, Infinium, IT&E and Aztec were required,

among other things, to (a) file with the SEC annual financial statements (Form 10-K) audited by

an independent accountant; (b) file with the SEC quarterly updates of their financial statements

(Form 10-Q) that disclosed their financial condition and the results of their business operations

for a three-month period; (c) file with the SEC current reports about events enumerated by the

SEC (Form 8-K); and (d) make and keep books, records, and accounts that accurately and fairly

reflected the companies' business transactions. The current reports, quarterly financial

statements and year-end financial statements for Infinium, IT&E and Aztec were transmitted

electronically to the SEC in Washington, D.C.

## COUNT ONE
### Conspiracy to Commit Mail Fraud and Securities Fraud
### (18 U.S.C. § 371)

27.     Paragraphs 1 through 26 of the General Allegation section of this Indictment are

realleged and incorporated by reference as if fully set forth herein.

28.     From in and around January 2004 through in and around December 2005, the

exact dates being unknown to the Grand Jury, in the District of Columbia and elsewhere, the

·defendant,

## SHELLY S. SINGHAL

and others, both known and unknown to the Grand Jury, unlawfully, willfully and knowingly

combined, conspired, confederated and agreed with one another and with others to commit

offenses against the United States of America, that is

a.      to willfully, knowingly, and unlawfully, by the use of means and instrumentalities

of interstate commerce, the mails, and the facilities of national securities exchanges, directly and

indirectly, use and employ manipulative and deceptive devices and contrivances in connection

with the offer, purchase and sale of Infinium, IT&E and Aztec securities, and did (I) employ a

device, scheme and artifice to defraud; (ii) make untrue statements of material facts and omit to

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (iii) engage in acts, practices, and courses of

business which would and did operate as a fraud and deceit upon others, in connection with the

7

purchase and sale of said securities, in violation of Title 15, United States Code, Sections 78j(b)

and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

      b.      to knowingly and with intent to defraud devise and intend to devise a scheme and

artifice to defraud, and to obtain money and property by means of materially false and fraudulent

pretenses, representations, and promises, knowing they were false and fraudulent when made, for

the purpose of executing such scheme and artifice and attempting so to do, did knowingly cause

to be sent, delivered and moved by the United States Postal Service newsletters recommending

the purchase of Infinium, IT&E and Aztec securities, in violation of Title 18, United States Code,

Section 1341.

## GOAL OF THE CONSPIRACY

29.      It was a goal of the conspiracy that the defendant SHELLY S. SINGHAL and his

co-conspirators would and did enrich themselves through the fraudulent promotion, control and

sale of Infinium, IT&E and Aztec securities.

## MANNER AND MEANS OF THE CONSPIRACY

30.      The defendant SHELLY S. SINGHAL and his co-conspirators used the following

manner and means, among others, to accomplish the objects and goal of the conspiracy:

      a      SBI USA entered into investment advisory agreements to provide

investment advisory services to Infinium, IT&E and Aztec.

      b.      The defendant SHELLY S. SINGHAL and others agreed with Jukka

Tolonen that, in exchange for the transfer of cash and shares of common stock, Tolonen would

prepare favorable newsletters recommending the purchase of publicly traded securities, which

would be paid for by the defendant SHELLY S. SINGHAL and others and disseminated to the investing public through the U.S. Postal Service.

        c.      The defendant SHELLY S. SINGHAL and others obtained shares of Infinium, IT&E and Aztec with the knowledge that favorable newsletters were to be prepared by Jukka Tolonen and disseminated to the investing public through the U.S. Postal Service, and with the expectation that the newsletters would cause the volume and price of Infinium, IT&E and Aztec shares to rise.

        d.      To enhance the effectiveness of the newsletters by concealing their connections to the companies and holdings in the recommended shares, the defendant SHELLY S. SINGHAL and others caused Jukka Tolonen and others to prepare and disseminate to the investing public through the U.S. Postal Service, including prospective investors in the District of Columbia, newsletters recommending the purchase of Infinium, IT&E and Aztec shares that were false and misleading in that the newsletters, among other things, (I) failed to disclose that Jukka Tolonen prepared the newsletters in exchange for Infinium, IT&E and Aztec shares, (ii) misrepresented that "non-affiliated" third parties had paid for the newsletters when, in fact, the defendant SHELLY S. SINGHAL and others, who were affiliated with the companies and controlled a substantial portion of the free trading shares of stock, had paid directly and indirectly for the newsletters, (iii) misrepresented the sources and amount of compensation paid to publish and disseminate the newsletters, and (iv) failed to disclose that the defendant SHELLY S. SINGHAL and others intended to sell their shares after the dissemination of the newsletters had caused the volume and price of the shares to rise.

e.      The defendant SHELLY S. SINGHAL and others would and did manipulate the trading volumes and share prices of IT&E and Aztec by coordinating the trading of those shares.

f.      The defendant SHELLY S. SINGHAL and others would and did misrepresent and conceal from the SEC, shareholders and prospective investors their control and beneficial ownership of over 10% of the outstanding shares of IT&E and Aztec.

g.      The defendant SHELLY S. SINGHAL and others would and did misrepresent and conceal from the SEC, shareholders and prospective investors their control of Aztec.

h.      The defendant SHELLY S. SINGHAL and others, after the newsletters were disseminated to the investing public and the volume and share prices of Infinium, IT&E and Aztec had risen because of the interest generated by the newsletters, sold Infinium, IT&E and Aztec shares to the investing public without disclosing the scheme to defraud, and thereby fraudulently obtained proceeds totaling at least $10,000,000.00.

## OVERT ACTS

31.     In furtherance of the conspiracy and to accomplish the objects thereof, the defendant SHELLY S. SINGHAL and his co-conspirators committed and caused to be committed the following overt acts, among others, in the District of Columbia and elsewhere:

### The Infinium Promotional Campaign

32.     In and about March 2004, SBI USA entered into an Investment Banking/Advisory Agreement with Infinium to provide investment banking services.

33.     In and about April 2004, at the defendant SHELLY S. SINGHAL's direction, Nominee D agreed to provide cash and approximately 200,000 free-trading shares of Infinium to pay for the newsletter recommending the purchase of Infinium shares in exchange for a greater amount of restricted shares of Infinium to be issued by Infinium.

34.     On and about April 26, 2004, the defendant SHELLY S. SINGHAL caused Nominee D to transfer $110,000.00 to pay for the newsletter recommending the purchase of Infinium shares.

35.     On and about May 27, 2004, the defendant SHELLY S. SINGHAL and Melissa Mahler arranged for Infinium to issue 400,000 restricted shares of Infinium to Nominee D to induce Nominee D to transfer 200,000 free-trading shares of Infinium to the defendant SHELLY S. SINGHAL to pay for the newsletter recommending the purchase of Infinium shares.

36.     On and about May 27, 2004, in exchange for 400,000 restricted shares of Infinium issued to Nominee D by Infinium, Nominee D transferred 200,000 free-trading shares of Infinium to the defendant SHELLY S. SINGHAL to pay for the newsletter recommending the purchase of Infinium shares.

37.     On and about June 1, 2004, the defendant SHELLY S. SINGHAL caused the transfer of 33,000 shares of Infinium to a nominee account for the benefit of Jukka Tolonen to pay for the newsletter recommending the purchase of Infinium shares.

38.     On and about June 16, 2004, the defendant SHELLY S. SINGHAL transferred 50,000 shares of Infinium from a brokerage account in his name to a nominee account for the benefit of Jukka Tolonen to pay for the newsletter recommending the purchase of Infinium shares.

11

39.     On and about June 14, 2004, the defendant SHELLY S. SINGHAL and others caused a false and misleading newsletter, entitled "Institutional Fortunes," purportedly paid for by "a non-affiliated third party," a trust controlled by Nominee D, recommending the purchase of Infinium shares, to be mailed to approximately 402,015 potential investors through the U.S. Postal Service, including approximately 16,031 newsletters directed to a bulk mailing center addressed as in the District of Columbia.

40.     Between on and about June 14, 2004 and on and about July 21, 2004, the defendant SHELLY S. SINGHAL caused the sale of approximately 189,480 shares of Infinium out of his personal brokerage account and a brokerage account in the name of SBI USA for total proceeds of approximately $290,698.99, taking advantage of the inflated volume and prices caused by the newsletter and receiving illicit proceeds from these sales.

### The IT&E Promotional Campaigns

41.     On and about March 30, 2004, SBI USA entered into an Investment Advisory/Banking Agreement with IT&E to be IT&E's exclusive financial advisor.

42.     On and about April 26, 2004, SBI USA and SBI Advisors wired $35,000.00 and $15,000.00, respectively, to Melissa Mahler as a loan.

43.     On and about May 5, 2004, at the defendant SHELLY S. SINGHAL's direction, Melissa Mahler repaid the loan by wiring $50,000.00 to pay for a newsletter recommending the purchase of IT&E shares.

44.     On and about May 27, 2004, SBI Brightline wired $55,000.00 to pay for a newsletter recommending the purchase of IT&E shares.

45.     In and about July 2004, the defendant SHELLY S. SINGHAL caused 300,000 IT&E shares to be delivered to a nominee account to pay Jukka Tolonen to prepare and disseminate newsletters recommending the purchase of IT&E shares.

46.     On and about July 20, 2004, the defendant SHELLY S. SINGHAL and others caused a false and misleading newsletter, entitled "James Smith's Consolidation Stock Alert," purportedly paid for by "a non-affiliated third party," Wire Mill Partners II, recommending the purchase of IT&E shares, to be mailed to approximately 392,665 potential investors through the U.S. Postal Service.

47.     On and about September 24, 2004, an account in the name of Credit Union A wired $100,000.00 to Wire Mill Partners II.

48.     On and about September 27, 2004, Wire Mill Partners II wired $99,250.00 to pay for a newsletter recommending the purchase of IT&E shares.

49.     On and about October 26, 2004, SBI OGRE wired $133,710.00 to pay for a newsletter recommending the purchase of IT&E shares.  The money was repaid to SBI OGRE through the following wire transfers:  On and about October 28, 2004, an account in the name of Credit Union A wired $135,000.00 to Alpharetta Merchant Partners; on and about October 29, 2004, Alpharetta Merchant Partners wired $133,710.00 to SBI Advisors; on and about October 29, 2004, SBI Advisors wired $133,710.00 to SBI OGRE.

50.     On and about November 5, 2004, the defendant SHELLY S. SINGHAL and others caused a false and misleading newsletter, entitled "Higher Yields," purportedly paid for by "a non-affiliated third party," Wire Mill Partners II, recommending the purchase of IT&E shares, to be mailed to approximately 540,158 potential investors through the U.S. Postal Service,

including approximately 25,503 newsletters directed to a bulk mailing center addressed as in the District of Columbia.

51.     On and about November 18, 2004, Businessperson B-2 sent an email to Businessperson A-1 advising Businessperson A-1 that, "[g]iven events of a less positive nature for IT&E, I think this is a good time for you to exit that position," while at the same time the defendant SHELLY S. SINGHAL and others were causing the dissemination of newsletters to unsuspecting investors recommending the purchase of IT&E shares.

52.     Between on and about July 22, 2004 and on and about December 9, 2004, at the direction of the defendant SHELLY S. SINGHAL and others, accounts in the name of SBI USA sold approximately 1,964,100 shares of IT&E generating proceeds of approximately $1,139,086.23, taking advantage of the inflated volume and prices caused by the newsletters and receiving illicit proceeds from these sales.

53.     Between on and about July 27, 2004 and on and about December 16, 2004, at the direction of the defendant SHELLY S. SINGHAL and others, an account in the name of Wire Mill Partners II sold approximately 315,925 shares of IT&E generating proceeds of approximately $216,945.58, taking advantage of the inflated volume and prices caused by the newsletters and receiving illicit proceeds from these sales.

54.     Between on and about July 23, 2004 and on and about December 9, 2004, the defendant SHELLY S. SINGHAL and others controlled a third-party account that sold approximately 2,984,950 shares of IT&E generating proceeds of approximately $1,281,094.27, taking advantage of the inflated volume and prices caused by the newsletters and receiving illicit proceeds from these sales.

### The Aztec Promotional Campaigns

55.     On and about July 8, 2004, Aztec entered into an Investment Advisory Agreement with SBI USA to provide investment advisory services in exchange for, among other things, shares of Aztec in the form of registered S-8 shares in the defendant SHELLY S. SINGHAL's name. The Investment Advisory Agreement specified that SBI USA agreed not to directly or indirectly promote Aztec's shares. On and about September 17, 2004, Aztec filed a Form 8-K with the SEC in the District of Columbia, attaching a copy of the Investment Advisory Agreement between Aztec and SBI USA.

56.     On and about July 22, 2004, Aztec entered into a Consulting Agreement with a company controlled by Businessperson C-1 to provide consulting services in exchange for, among other things, warrants for Aztec shares. The Consulting Agreement specified that Businessperson C-1's company agreed not to directly or indirectly promote Aztec's shares. On and about September 17, 2004, Aztec filed a Form 8-K with the SEC in the District of Columbia, attaching a copy of the Consulting Agreement between Aztec and Businessperson C-1's company.

57.     On and about August 6, 2004, the Board of Directors of Aztec, collectively, submitted a letter of resignation and, thereafter, the defendant SHELLY S. SINGHAL and others secretly obtained and exercised control of Aztec.

58.     From on and about August 6, 2004 through on and about July 20, 2005, the defendant SHELLY S. SINGHAL and others caused filings to be made with the SEC in the District of Columbia purporting to be signed by officers and directors of Aztec, knowing that

such officers and directors of Aztec had submitted a letter of resignation on and about August 6, 2004 and, thus, had not in fact signed such filings.

59.     On and about September 14, 2004, the defendant SHELLY S. SINGHAL arranged for the sale of 2,000,000 shares of Aztec at a discounted price of $0.11 a share to Jukka Tolonen and another to compensate Jukka Tolonen for preparing and disseminating newsletters recommending the purchase of Aztec shares, and intending to use the proceeds from the share sale to prepare and disseminate newsletters recommending the purchase of Aztec shares.

60.     Between on and about September 17, 2004 and on and about September 29, 2004, the defendant SHELLY S. SINGHAL obtained 4,875,000 shares of Aztec, which comprised over 10% of the outstanding shares of Aztec, with advance knowledge that favorable newsletters were to be issued on Aztec.

61.     From in and about September 2004 through on and about July 20, 2005, the defendant SHELLY S. SINGHAL and others caused filings to be made with the SEC in the District of Columbia that misrepresented the amount of shares of Aztec issued to the defendant SHELLY S. SINGHAL and failed to disclose that the defendant SHELLY S. SINGHAL had obtained 4,875,000 shares of Aztec and beneficially owned and controlled more than 10% of the outstanding shares of Aztec.

62.     From in and about September 2004 through on and about July 20, 2005, the defendant SHELLY S. SINGHAL and others caused filings to be made with the SEC in the District of Columbia that misrepresented the amount of warrants sold to an affiliate of Company A by Aztec and failed to disclose that Aztec had sold 2,000,000 warrants to an affiliate of Company A for $100.00, exercisable during the ensuing five-year period at $2 per share.

63.     From on and about September 9, 2004 through on and about March 24, 2005, at the direction of the defendant SHELLY S. SINGHAL and others, monies were wired directly and indirectly to Bedford Proprietary Trading from the defendant SHELLY S. SINGHAL, SBI USA, SBI OGRE, Businessperson C-1, Jukka Tolonen and others to pay for newsletters recommending the purchase of Aztec shares.

64.     From on and about September 10, 2004 through on and about March 21, 2005, at the direction of the defendant SHELLY S. SINGHAL and others, Bedford Proprietary Trading wired monies to various vendors to pay for newsletters recommending the purchase of Aztec shares.

65.     From on and about September 27, 2004 to on and about April 13, 2005, the defendant SHELLY S. SINGHAL and others caused false and misleading newsletters, entitled "Energy Profits," purportedly paid for by "a non-affiliated third party," Bedford Proprietary Trading, recommending the purchase of Aztec shares, to be mailed to approximately 2 million potential investors, including newsletters directed to potential investors in the District of Columbia, through the U.S. Postal Service.

66.     From on and about October 1, 2004 through on and about May 31, 2005, the defendant SHELLY S. SINGHAL and Businessperson B-2, from accounts that they controlled, sold approximately 2,574,867 shares of Aztec for proceeds of approximately $4,488,577.79, taking advantage of the inflated volume and prices caused by the newsletters and receiving illicit proceeds from these sales.

67.     From on and about October 7, 2004 through on and about May 26, 2005, Businessperson C-1, from accounts controlled by the defendant SHELLY S. SINGHAL and

others, sold approximately 2,353,880 shares of Aztec for proceeds of approximately

$4,051,815.10, taking advantage of the inflated volume and prices caused by the newsletters and

receiving illicit proceeds from these sales.

**(Conspiracy, in violation of Title 18, United States Code, Section 371.)**

**COUNT TWO**
**Mail Fraud**
**(18 U.S.C. § 1341)**

68.     Paragraphs 1 through 26 of the General Allegation section, paragraph 30.a

through 30.h of the Manner and Means section, and paragraphs 31 through 67 of the Overt Acts

section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

69.     From in and about January 2004 through in and about December 2005, the

defendant SHELLY S. SINGHAL and others engaged in a scheme to artificially inflate the

market price of, and market demand for, Infinium, IT&E and Aztec shares.  To fraudulently

induce investors to purchase Infinium, IT&E and Aztec shares, the defendant SHELLY S.

SINGHAL and others, among other things, caused to be transmitted throughout the United States

false and misleading newsletters recommending the purchase of Infinium, IT&E and Aztec

shares that, among other things:

a.     falsely described the sources and amount of compensation paid to publish

and disseminate the newsletters;

b.     falsely described the entities paying for the newsletters as "non-affiliated

third part[ies]";

c.     failed to disclose that the newsletters were prepared by Jukka Tolonen in

exchange for the transfer of Infinium, IT&E and Aztec shares;

18

    d.  failed to disclose that the defendant SHELLY S. SINGHAL and others, who controlled a substantial portion of the free-trading stock of the companies and who were affiliated with the companies, paid directly and indirectly for the publication and dissemination of the newsletters; and

    e.  failed to disclose that the defendant SHELLY S. SINGHAL and others intended to profit on the sale of these shares after the dissemination of the newsletters had caused the volume and price of the shares to rise.

   70.  Through the use of these false and misleading newsletters, the defendant SHELLY S. SINGHAL and others artificially inflated the trading volume and price of Infinium, IT&E, and Aztec, and then sold shares of those companies that they controlled for substantial proceeds.

   71.  In connection with the false and misleading newsletters, the defendant SHELLY S. SINGHAL and others would and did manipulate the trading volumes and share prices of IT&E and Aztec by secretly coordinating the trading of those shares.

   72.  In connection with the false and misleading newsletters, the defendant SHELLY S. SINGHAL failed to disclose his control and beneficial ownership of over 10% of the outstanding shares of IT&E and Aztec, and caused false and misleading statements to be filed with the SEC in the District of Columbia concerning his control and beneficial ownership of over 10% of the outstanding shares of IT&E and Aztec.

   73.  In connection with the false and misleading newsletters, the defendant SHELLY S. SINGHAL and others caused false and misleading statements to be filed with the SEC in the District of Columbia concerning their control of Aztec.

74. On and about the dates set forth below, in the District of Columbia and elsewhere, the defendant SHELLY S. SINGHAL unlawfully, willfully, and knowingly, and with intent to defraud, devised and intended to devise a scheme and artifice to defraud, namely, the scheme set forth above, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing they were false and fraudulent when made, for the purpose of executing such scheme and artifice and attempting so to do, did knowingly place and cause to be placed in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service and did knowingly deliver and cause to be delivered by mail matters and things according to the direction thereon and at the place at which they were directed to be delivered by the person to whom they were addressed, the following newsletters recommending the purchase of Aztec Oil & Gas, Inc. securities:

| COUNT | ON AND ABOUT DATE | MAILING |
|-------|-------------------|---------|
| TWO | 4/11/2005 | "Energy Profits," mailed from Waseca, Minnesota and directed to approximately 1087 addresses in Washington, D.C. |

**(Mail Fraud, in violation of Title 18, United States Code, Section 1341.)**

**COUNT THREE**
**Securities Fraud**
**(15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2)**

75.     Paragraphs 1 through 26 of the General Allegation section, paragraph 30.a

through 30.h of the Manner and Means section, and paragraphs 31 through 67 of the Overt Acts

section of this Indictment are realleged and incorporated by reference as if fully set forth herein.

76.     From in and about January 2004 through in and about December 2005, in the

District of Columbia and elsewhere, the defendant SHELLY S. SINGHAL by the use of means

and instrumentalities of interstate commerce, the mails, and the facilities of national securities

exchanges, did use and employ, in connection with the purchase and sale of securities,

manipulative and deceptive devices and contrivances in violation of Rule 10b-5 (Title 17, Code

of Federal Regulations, Section 240.10b-5), by (a) employing devices, schemes, and artifices to

defraud; (b) making untrue statements of material facts and omitting to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (c) engaging in acts, practices, and courses of business which

operated and would operate as a fraud and deceit upon the SEC, purchasers and prospective

purchasers in connection with the purchase and sale of Aztec Oil & Gas, Inc. securities.

> **(Securities Fraud, Aiding and Abetting, Causing an Act to be Done, in violation of
> Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal
> Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)**

## FORFEITURE ALLEGATION

77.     As a result of conspiring to commit mail fraud and securities fraud, and committing mail fraud and securities fraud, as alleged in Counts One through Three of this Indictment, in violation of Title 18, United States Code, Section 371, Title 18 United States Code, Section 1341, Title 15 United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2, the defendant SHELLY S. SINGHAL shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to, a sum of money equal to $10,000,000.00 in United States currency, representing the amount of money and assets obtained as a result of the above-listed offenses, for which the defendant is jointly and severally liable.

### Substitute Asset Provision

78.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and

Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said

defendant up to the value of the above forfeitable property.

**(Criminal Forfeiture, in violation of Title 18, United States Code, Sections 981(a)(1), 982, Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461.)**

A TRUE BILL:

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA

23